**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**INLAND DIAMOND PRODUCTS CO.,**

**Plaintiff,**

**v.** **Case No. 20-C-352**

**CHERRY OPTICAL, INC.,**

**Defendant.**

---

## DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

Eyeglasses are not a new invention. Plaintiff Inland Diamond Products Co. (Inland) claims, however, that it is the owner of two patents that teach a novel way of securely situating plastic lenses in eyeglass frames. Inland accuses Defendant Cherry Optical, Inc. (Cherry), of infringing its patents, U.S. Patent No. 8,636,360 (the '360 patent) and U.S. Patent No. 9,405,130 (the '130 patent), which involve a method for forming a beveled lens for use with eyeglasses. This matter comes before the court on the parties' cross-motions for summary judgment.

This is not the first time that this court has addressed summary judgment in this case. The court granted Cherry's previous motion for summary judgment and dismissed the case in a decision and order entered on September 28, 2023, on the grounds that the asserted claims of the two patents were invalid. Dkt. No. 136. In granting summary judgment in Cherry's favor at that time, the court relied in part on the 2019 Final Written Decision of the United States Patent Trial and Appeal Board (PTAB) in an inter partes review (IPR), which held claims 1, 3, 7, 8, and 12 of the '360 patent and claims 1, 3, 6, 7, 8, and 10 of the '130 patent obvious and therefore invalid. Dkt. Nos. 106-6 & 106-7. The court concluded that the PTAB's rulings had preclusive effect with

respect to claims 1 and 3 of the ‘360 and ‘130 patents, from which the claims asserted in this case depended and, thus, Inland was barred from relitigating the validity of the limitations of those claims in this case under the doctrine of issue preclusion. Dkt. No. 136 at 7–8.

The court then proceeded to consider Cherry’s arguments that the remaining limitations in the claims asserted in the case (claims 2, 4, and 6 of the ‘360 patent and claim 4 of the ‘130 patent) were likewise invalid. The court concluded that the additional limitations in these claims were “familiar elements as shown by the numerous prior art references [Cherry] cites” and that “combining the teachings of [the prior art cited by Cherry] to include the particular bevel and triangle heights and apex angles taught in the prior art references identified by [Cherry] would yield predictable results for forming a beveled lens for use with eyeglasses.” *Id.* at 12. The court found that “it would have been obvious for a person of ordinary skill in the art to combine the teachings and references in the prior art to invent the claimed method” and that “[t]his finding is not overcome by [Inland’s] evidence of non-obviousness.” *Id.* at 14. As a result, Cherry’s motion for summary judgment was granted and the case dismissed. *Id.*

Inland appealed, however, and the court’s judgment was vacated by the Federal Circuit. Dkt. No. 166-1, *Inland Diamond Prods. Co. v. Cherry Optical Inc.*, 155 F.4th 1365 (Fed. Cir. 2025). The Federal Circuit held, based on two decisions it had issued since this court’s entry of summary judgment, that this court had erred in giving the PTAB’s Final Written Decision preclusive effect on the validity of the limitations in the claims from which the claims asserted by Inland depended. Citing its decisions in *Kroy IP Holdings, LLC v. Groupon, Inc.*, 127 F.4th 1376 (Fed. Cir. 2025), and *ParkerVision, Inc. v. Qualcomm Inc.*, 116 F.4th 1345 (Fed. Cir. 2024), the court held that issue preclusion did not apply to IPR proceedings because the burden of proof applied by the PTAB in IPR proceedings was less than that required for invalidity in district court.

*Inland Diamond*, 155 F.4th at 1368. In IPR proceedings, the burden of proof for invalidity is preponderance of the evidence, whereas in district court, the burden is clear and convincing evidence. Additionally, at the time it issued its Final Written Decision in the pertinent IPR proceedings, the PTAB applied the broadest reasonable construction of the claims standard, while district courts were required to apply the standard established in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 155 F.4th at 1369 n.4. Noting that "one well-known exception to issue preclusion is where the second action involves application of a different legal standard," the court concluded that "no Board finding estopped the patentee from presenting evidence on the unresolved question of whether the patent challenger could prove the prior-art-related facts by clear and convincing evidence." *Id.* at 1368 (quoting *ParkerVision*, 116 F.4th at 1362) (cleaned up). The court therefore vacated this court's decision and remanded the case for a determination of whether Cherry was entitled to summary judgment under the proper standard. *Id.* at 1369–70.

Although this court understands that the doctrine of issue preclusion does not apply for the reasons explained by the Federal Circuit, there is still the question of whether the PTAB's decision is nevertheless fully binding on the courts for another reason. In *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, the Supreme Court rejected the claim that IPR proceedings violate Article III and the Seventh Amendment by conferring judicial power on an executive branch agency and depriving a patentee of the right to a jury trial. 584 U.S. 325 (2018). The Court noted that "[i]nter partes review involves the same basic matter as the grant of a patent" in the first place; "like the PTO's initial review, the Board's inter partes review protects the public's paramount interest in seeing that patent monopolies are kept within their legitimate scope." *Id.* at 336–37 (internal quotation marks and citation omitted). Because patents fall within the public rights doctrine and "granting patents is one of the constitutional functions that can be carried out

by the executive or legislative departments without judicial determination," *id.* at 335–36 (internal quotation marks and citation omitted), the Court concluded that neither Article III nor the Seventh Amendment apply to IPR proceedings. *Id.* at 343–45.

If, as *Oil States Energy Services* held, the PTAB's decision in IPR proceedings is no less the decision of the PTO than a patent examiner's initial decision granting or denying a patent application, it would seem a Final Decision of the PTAB rejecting a claim as obvious would be fully binding on the courts wholly aside from principles of issue preclusion. The PTAB's rejection of claim 1 of each patent as obvious, it would seem, is no different than if both claims had been rejected by the patent examiner who was originally assigned the applications. It is a decision of the PTO no less than the initial decision granting the applications and would seem to eliminate any presumption of validity that otherwise would apply.

In addition, the Federal Circuit's holding that the PTAB's decision finding a claim obvious is not binding as to dependent claims also leaves unanswered the question why, if the lesser burden of proof and less stringent standard for claim construction in IPR proceedings render the PTAB's Final Written Decision nonbinding in the district court's assessment of other claims depending from the cancelled claim, it is nevertheless binding on the cancelled claim itself. If the use of different legal standards in IPR proceedings means that the PTAB's decision as to the validity of an independent claim is not binding on a court's determination of the validity of claims that depend from that claim, then why should the PTAB decision be given any effect at all?

Notwithstanding these questions, the court understands it must comply with the Federal Circuit's mandate. Accordingly, on remand the court must determine whether "a reasonable jury could *only* find, by clear and convincing evidence, facts showing that the prior art disclosed or would have rendered obvious the Asserted Claim as a whole (i.e., not just whatever limitations it

contains beyond the relevant Unpatentable Claim(s)).” 155 F.4th at 1370. For the reasons that follow, the court concludes that this standard has been met. Cherry’s motion for summary judgment on validity will therefore be granted and the case dismissed.

**BACKGROUND**

The ‘360 and ‘130 patents are related and are both entitled “Beveling Wheel, Method for Forming a Beveled Lens for Use with Eyeglasses and a Beveled Lens.” The ‘360 patent issued on January 28, 2014, and the ‘130 patent issued on August 2, 2016. Inland is the sole owner of the patents, but it does not practice the patents. The patents are directed to technology for securing lenses within an eyeglass frame. The lenses include a bevel (highlighted in yellow below) that fits within a retention structure channel of the eyeglass frame (highlighted in red):

FIG. 2




*Hoya* Claim Construction Memorandum Opinion and Order, Dkt. No. 129-13 at 3 (citing Fig. 2 of the ‘360 and ‘130 patents).

Cherry is an optical lens manufacturer that makes and offers for sale numerous optical lenses. It does not produce or manufacture eyeglass frames. Instead, Cherry cuts, edges, coats, and performs the necessary steps to provide lenses to fit into a frame. Some of the lenses manufactured and sold by Cherry include a prescription plastic lens with the accused VEE bevel

and hide-a-bevel lenses, intended for use in eyeglasses. Inland asserts dependent claims 2, 4, and 6 of the ‘360 patent and dependent claim 4 of the ‘130 patent.

Claim 2 of the ‘360 patent depends from claim 1. Claim 1 provides:

> A prescription plastic lens for use in an eyeglass frame, said eyeglass frame having a receiving channel defined by opposed interior wall surfaces having a first angle therebetween, the receiving channel having a channel bottom at one end and a channel opening at the other end, the plastic lens comprising:
>
> a prescription lens body generally defined by a peripheral edge, the peripheral edge having a bevel extending away from the peripheral edge to a vertex, the bevel having a distal portion having a second angle defined between opposing sides of the bevel adjacent to the vertex, the bevel being receivable within the receiving channel, at least a portion of the vertex of the bevel being in contact with the receiving channel bottom and having an interference fit with the receiving channel bottom when held within the eyeglass frame, the first angle being greater than the second angle;
>
> wherein the portion of the vertex in contact with the receiving channel bottom is in compression once the plastic lens is fitted in the frame.

‘360 patent col. 8 l. 36–55, Dkt. No. 1-1. Claim 2 states that the height of the bevel ranges from 0.25 millimeters to 1.1 millimeters. *Id.* col. 8 l. 56–57. Claims 4 and 6 depend from claim 3. Claim 3, which also depends from claim 1, requires that the bevel be a triangle having an apex. *Id.* col. 8 l. 58–59. Claim 4 additionally requires that the apex have an angle in the range from 100 degrees to 130 degrees. *Id.* col. 8 l. 60–61. Finally, claim 6 requires that the height of the triangle range from 0.25 millimeters to 1.1 millimeters. *Id.* col. 8 l. 64–65.

As for the ‘130 patent, asserted claim 4 depends from claims 1 and 3. Claim 1 provides:

> A pair of eyeglasses, comprising:
>
> an eyeglass frame having a receiving channel, the receiving channel defined by opposed interior wall surfaces having a first angle therebetween, the receiving channel having a channel bottom at one end and a channel opening at the other end; and
>
> a prescription plastic lens secured in the eyeglass frame and including a body having a peripheral edge, the peripheral edge having a bevel extending away from the peripheral edge to a vertex, the bevel having a distal portion having a second angle

> defined between opposing sides of the bevel adjacent to the vertex and being less than the first angle of the receiving channel, at least a portion of the vertex of the bevel being in contact with the receiving channel bottom, having an interference fit with the receiving channel bottom, and being in compression.

'130 patent col. 8 l. 51–67, Dkt. No. 1-2. Claim 3 depends from claim 1 and requires that the bevel be a triangle having an apex. *Id.* col. 9 l. 3–4. Claim 4 depends from claim 3 and requires that the apex have an angle in the range from 100 degrees to 130 degrees. *Id.* col. 9 l. 5–6.

Cherry seeks summary judgment on the grounds that the patents at issue are invalid and are not infringed in any event. It asserts that claims 2, 4, and 6 of the '360 patent and claim 4 of the '130 patent are invalid as anticipated under 35 U.S.C. § 102 and as obvious under 35 U.S.C. § 103. Inland, on the other hand, seeks a summary judgment determination that the asserted claims are valid and that Cherry has infringed its patents.

**APPLICABLE LAW GOVERNING VALIDITY**

"A patent issued from the United States Patent and Trademark Office (PTO) bears the presumption of validity under 35 U.S.C. § 282. An accused infringer, therefore, must prove patent invalidity under the clear and convincing evidentiary standard." *Metabolite Lab'ys, Inc. v. Lab'y Corp. of America Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004) (citing *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272 (Fed. Cir. 2000)). "Clear and convincing evidence is evidence that places in the fact finder an abiding conviction that the factual contentions at issue are highly probable to be true." *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 141 F.4th 1367, 1374 (Fed. Cir. 2025) (internal quotation marks and citation omitted). But the burden of proof only comes into play when there are factual disputes that are material to the outcome of the case. Where the material facts are undisputed, the court applies the law to those undisputed facts.

A patent is invalid if the invention it claims was either anticipated or obvious at the time the patent was issued. As relevant here, a patent is invalid as anticipated if "the claimed invention

was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(1). In order to anticipate the claimed invention, a prior art reference must "disclose all elements of the claim within the four corners of the document," and it must "disclose those elements 'arranged as in the claim.'" *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008) (quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983)).

"[A] reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (alteration in original) (quoting *In re Petering*, 301 F.2d 676, 681 (CCPA 1962)). A prior art reference may also anticipate "when the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it." *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." *Id.* "[I]nherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure." *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). "Where . . . the result is a necessary consequence of what was deliberately intended, it is of no import that the article's authors did not appreciate the results." *MEHL/Biophile Int'l Corp.*, 192 F.3d at 1366.

A patent claim is invalid due to obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art

to which the claimed invention pertains." 35 U.S.C. § 103. In *Graham v. John Deere Co. of Kansas City*, the Court set out a framework for applying the statutory language of § 103:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

383 U.S. 1, 17–18 (1966).

In *KSR International Co. v. Teleflex Inc.*, the Court reaffirmed the *Graham* factors, noting that "[w]hile the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls." 550 U.S. 398, 407 (2007). The Court also noted in *KSR* that for over a half century, it had held that a "patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." *Id.* at 415–16 (quoting *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152–53 (1950)). "This is a principal reason," the Court explained, "for declining to allow patents for what is obvious. The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Indeed, the Rule mandates entry of summary judgment when a proper showing is made: "The court *shall* grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

(emphasis added). As the Supreme Court has made clear, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment also plays an important role in patent cases. The Federal Circuit noted more than 40 years ago:

> Many, if not most suits for patent infringement give rise to numerous and complex fact issues, rendering those suits inappropriate for summary disposition. When no issue of material fact is present, however, courts should not hesitate to avoid an unnecessary trial by proceeding under Fed. R. Civ. P. 56 without regard to the particular type of suit involved.

*Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984) (citation omitted).

The fact that the parties filed cross-motions for summary judgment does not alter this standard. In evaluating each party's motion, the court must "construe all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (internal quotation marks and citation omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*

Expert opinion does not necessarily create an issue of fact on the issue of obviousness. "In considering summary judgment on that question the district court can and should take into account expert testimony, which may resolve or keep open certain questions of fact." *KSR*, 550 U.S. at 427. But that is not the end of the issue. "The ultimate judgment of obviousness is a legal

determination. Where . . . the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *Id.* (citation omitted).

**ANALYSIS**

Claim construction is not at issue in this case. The parties stipulated to the construction of the patent claims that the United States District Court for the Eastern District of Texas arrived at in a previous case brought by Inland against Hoya Optical Labs of America, Inc. Dkt. No. 129-13. Cherry contends that, given the undisputed facts of the case, the asserted claims of the '360 and '130 patents, as construed by the *Hoya* court, are invalid as anticipated and/or obvious in light of the prior art.

The asserted claims include claims 2, 4, and 6 of the '360 patent and claim 4 of the '130 patent. Although claims 1 and 3 of the '360 patent and claims 1 and 3 of the '130 patent, among others, were found obvious and therefore invalid by the PTAB, the asserted claims depend from one or more of those claims. And even though the claims from which the asserted claims depend have been cancelled and thus cannot be directly asserted by Inland, the Federal Circuit has held that the PTAB's cancellation of those claims on reconsideration is not binding on the courts in the assessment of dependent claims since the burden of proof before the PTAB and, when the IPR occurred in this case, the applicable claim construction standard, were less stringent. Accordingly, the court must begin its analysis with independent claim 1 of each patent.

A key feature of each patent is that the bevel on the periphery of the lens "contacts at least a portion of the channel bottom." '360 patent col. 2 l. 15; '130 patent col. 2 l. 25. In other words, when the lens is inserted into the frame, the bevel on the edge of the lens is in contact with the

bottom of the groove or channel into which it is received. This feature is foundational to claim 1 of each patent.

In their description of the background of the invention, each patent notes that one of the failure modes in the prior art occurred when lenses made of glass would crack "as a result of having an interference fit of the vertex of the bevel with a bottom of a channel portion of the eyeglass frame." '360 patent col. 1 l. 22–54; '130 patent col. 1 l. 31–62. To avoid this problem, the practice was to have the bevel vertex "not in contact with the bottom of the channel of the eyeglass frame." '360 patent col. 1 l. 26–27; '130 patent col. 1 l. 35–36. With the advent of plastic lenses, however, the cracking is no longer a problem, given the properties of plastic. And because plastic lenses had a tendency to fall out of the frames when the bevels were not fully inserted into the channel in the frame, the patents called for "a beveling wheel which can manufacture a bevel on the lens that can overcome, at least to some degree, the issues of shrinkage, stress and cracking of the lenses." '360 patent col. 1 l. 50–53; '130 patent col. 1 l. 59–62. This history suggests that the inventor was not so much offering a new invention, as recommending a return to the practice that was found problematic when used with glass lenses.

In support of its contention that the asserted claims of the patents are invalid, Cherry relies principally upon the *Gottschald* reference. Dkt. No. 106-18. *Gottschald* is a patent listed among the prior art references in both the '360 and '130 patents. Its English title is "Method and Device for Forming a Bevel on the Edge of a Spectacle Lens." *Id.* at 33. *Gottschald* teaches a method of using a Computer Numerically Controlled (CNC) machining apparatus for forming a bevel on the edge of a spectacle lens. *Id.* at 34. The problem *Gottschald* is intended to address is the wear that occurs to the grinding wheel that creates the bevel groove, "which leads not only to a slow increase in the size of the finish-ground spectacle lenses, but also to an increase in the angle of the bevel,

i.e., to a flattening." *Id.* The apparatus performs the following steps: optically scans the bevel groove of a spectacle lens opening in a selected spectacle frame, including the cross-sectional shape and the circumference of the bevel groove; inputs the determined values into a control device of the spectacle lens edge machining apparatus; scans the bevel groove of a spectacle lens machining tool with regard to diameter and cross-sectional shape; inputs the determined values into the control device of the spectacle lens edge machining apparatus; and compares the values of the bevel groove of the spectacle frame with the values of the bevel groove of the spectacle lens edge machining tool. The apparatus then carries out the machining of the bevel using the determined values if the compared values are within predetermined first or second tolerance ranges; it interrupts the machining of the bevel if the compared values are outside of the first and the second tolerance range. *Id.* at 36, 51.

It is not the apparatus that *Gottschald* describes that Cherry contends anticipates claim 1 of the '360 and '130 patents. Instead, it is the product, i.e., the beveled lens, that the apparatus was designed to produce that Cherry claims anticipates the independent claims of the two patents. For the apparatus *Gottschald* describes is designed to form beveled lenses that fit into eyeglass frames in precisely the same manner as claimed in the '360 and '130 patents. The apparatus ensures that the bevel on the periphery of the lenses is of such a dimension that it is fully inserted into the channel formed on the eyeglass frame and is in contact with the bottom of the channel. The claimed invention in *Gottschald* is also designed to prevent the normal wear that naturally results from continued use of the grinding wheel from causing the apparatus to produce lenses that deviate from that standard. *Gottschald* teaches that, as a result of its process, "[a] spectacle lens of which the contour has been ground to accurate dimensions can therefore simply be inserted in a corresponding spectacle frame and it bears with the tip of the bevel against the bevel base of the

spectacle frame." *Id.* at 46. Figure 6 of *Gottschald*, shown below, demonstrates the fit between the lens bevel and the groove in the eyeglass frame.

Fig. 6




*Id.* at 28. Figure 6 depicts bevel 43 bearing against the bevel groove 35 of the eyeglass frame 42. *Gottschald* also describes another figure where the bevel groove is so deep that the tip of the lens bevel is not in contact with the base of the groove. *Gottschald* teaches that this configuration does not work because "the spectacle lens is not held securely in the bevel groove." *Id.* at 48 (describing *Gottschald* Figure 9).

Cherry argues that *Gottschald*, which was published in 1999, teaches every element of claim 1 of both the '360 and '130 patents. It thus follows, Cherry contends, that both claims are anticipated and invalid as a matter of law.

Inland argues in response that *Gottschald* fails to teach several crucial limitations of claim 1 of each patent. Inland contends that Cherry's argument that *Gottschald* anticipates the asserted claims fails "because *Gottschald* (1) fails to disclose the size of the lens as compared to the frame, (2) fails to ever utilize the term 'interference fit' or a relationship between the size of the lens and the frame, and (3) is directed to glass lenses—which are incapable of having an interference fit." Dkt. No. 129 at 11.

As an initial matter, the fact that *Gottschald* fails to utilize the term "interference fit" is irrelevant to whether it anticipates claim 1 of the '360 and '130 patents. It is the substance of the disclosure, not the unique terminology used, that determines the scope of a patent. Using new terminology or "jargon" to describe old inventions does not make them new or novel. The issue is whether *Gottschald* either expressly or inherently discloses what the asserted patents call an "interference fit," not whether *Gottschald* utilizes the same term as the patents. The *Hoya* court construed the term "interference fit" as follows:

- "the vertex of the bevel being in contact with the receiving channel bottom and having an interference fit with the receiving channel bottom" means "the contact of the bevel's vertex with the bottom of the receiving channel where the height of the bevel is greater than the depth of the receiving channel and where the lens as a whole is larger than the frame's area in which to receive the lens;"

- "the vertex of the bevel being in contact with the receiving channel bottom, having an interference fit with the receiving channel bottom" means "the contact of the bevel's vertex with the bottom of the receiving channel where the height of the bevel is greater than the depth of the receiving channel and where the lens as a whole is larger than the frame's area in which to receive the lens;"

- "the vertex contacting and forming an interference fit with a bottom of the receiving channel" means "the contact of the bevel's vertex with the bottom of the receiving channel where the height of the bevel is greater than the depth of the receiving channel and where the lens as a whole is larger than the frame's area in which to receive the lens."

Dkt. No. 129-13 at 18–19. Inland notes that this construction requires the lens as a whole to be larger than the frame's area that receives the lens. Inland contends that because nothing in *Gottschald* is directed to the size of the lens as compared to the size of the frame, it does not anticipate claim 1 of either patent.

The fact that *Gottschald* does not explicitly refer to the comparative size of the lens to the frame, however, does not mean this limitation is missing. The structure of eyeglasses requires that

the lens be situated in the opening through which the user's sight is directed. The formation of a bevel on the periphery of the lens so that it fits the groove in the frame for the glasses requires that the lens be larger than the opening in the frame in which the lens is to be situated. If the lens as a whole is not larger than that opening, the bevel on its periphery would not be inserted into the groove and hold the lens in place. The lens would fall out of the glasses. There would be no interference fit. This is especially clear when one considers *Gottschald*'s tolerance ranges in claims 1, 4, and 6. Dkt. No. 106-18 at 51–53.

Simple logic and a rudimentary understanding of geometry make clear that the lens must be larger than the opening. A court is not foreclosed from using common sense and logic in assessing the validity of patent claims. And putting into words a limitation that is inherent in the very structure of a device does not make the device novel. *See MEHL/Biophile Int'l Corp.*, 192 F.3d at 1365–67 (anticipation found where prior art reference discloses limitations of the claimed invention, either explicitly or inherently).

Inland also argues that *Gottschald* applies only to glass lenses and claim 1 of the two patents refers to "[a] prescription plastic lens for use in an eyeglass frame." '360 patent col. 8 l. 36. For this reason, as well, Inland contends *Gottschald* does not anticipate claim 1 of the '360 and '130 patents. But *Gottschald* is not limited to glass lenses. Although it refers to lenses generally, it expressly states that contact pressure during part of the process can be adjusted "for spectacle lenses made of plastic or silicate glass as well as in accordance with the edge thickness of the spectacle lens, which is dependent on the optical values of the spectacle lens." Dkt. No. 106-18 at 45. Moreover, even if the apparatus claimed in *Gottschald* was intended primarily for glass lenses, this would not limit its teaching on the subject of lenses generally, including plastic lenses. "A reference may be from an entirely different field of endeavor than that of the claimed

invention or may be directed to an entirely different problem from the one addressed by the inventor, yet the reference will still anticipate if it explicitly or inherently discloses every limitation recited in the claims." *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997).

In its response to Cherry's supplemental brief in support of its motion for summary judgment, Inland also contends that *Gottschald* lacks the compression element of claim 1 of the '360 and '130 patents. Dkt. No. 177 at 10. Claim 1 of both patents requires the vertex of the lens bevel to be in contact with the receiving channel bottom, have an interference fit with the receiving channel bottom, and be in compression. The *Hoya* court construed the term "in compression" to mean "compacted." Dkt. No. 129-13 at 22. Inland contends that *Gottschald* cannot be reasonably read to include this limitation because it applies to glass lenses, not plastic, and placing a glass lens "in compression" would cause it to shatter.

But again, *Gottschald* applies to lenses in general and explicitly includes plastic lenses. Dkt. No. 106-18 at 45. Moreover, *Gottschald* teaches a lens that "bears with the tip of the bevel against the bevel base of the spectacle frame" so that it is "held securely in the bevel groove." *Id.* at 46, 48. In addition, the "compacted" limitation is inherent in *Gottschald*. The very nature of eyeglasses or, in the terminology used in *Gottschald*, spectacles, requires that the lenses be securely fit to the frame in which they are placed. For the lenses to be held securely in the frames, there must be some degree of force holding them in place; they must be "compacted." The court therefore concludes that this element of claim 1 of the patents is also met.

Claim 3 of the '360 patent claims "the lens of claim 1, wherein the bevel is a triangle having an apex." '360 patent col. 8 l. 58–59. Figure 6 of *Gottschald* shows the bevel 43 is a triangle having an apex. It thus follows that *Gottschald* discloses the additional element of claim 3 and thus anticipates claim 3 of the '360 patent as well.

In sum, the court concludes on the undisputed evidence of record that *Gottschald* anticipates each of the limitations in claim 1 of both patents and claim 3 of the '360 patent. Those claims are therefore invalid. In the alternative, the claims are obvious in light of *Gottschald* and *Schaeffer*, a patent application with a publication date of May 2008. Dkt. No. 106-19. *Schaeffer* is directed to a machine programmed to edge an ophthalmic lens blank, similar to *Gottschald*. *Id.* at 1. *Schaeffer* teaches that prescription eyeglass lenses "are formed from glass or plastic lens 'blanks' having certain desired properties to provide the correct prescription for the patient. . . . The lens blank may be shaped using an edger . . . . The blank is edged so that the periphery of the finished lenses fit into the openings on the frames." *Id.* at 6.

In reaching this conclusion, the court has considered the report and opinions of Inland's expert, J. Edward de Rojas. Mr. de Rojas opined that *Gottschald* did not apply to plastic lenses because a person of ordinary skill would not place a glass lens under compressive interference because of the serious risk of cracking or shattering. Expert Report of Ed de Rojas Regarding Validity, Dkt. No. 129-3 at ¶¶ 40, 42, 44, 46–54. But as noted above, the patent itself refers to plastic lenses. The opinion of an expert does not override the clear language of the prior art. Mr. de Rojas also opined that the apparatus and method described in *Gottschald* is not practical for plastic lenses because of the different qualities of plastic as compared to glass. But "[t]he fact that a technology may be impractical does not undermine an otherwise anticipatory disclosure." *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1355 (Fed. Cir. 2008) (citing *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998) ("The fact that a modem with a single carrier data signal is shown to be less than optimal does not vitiate the fact that it is disclosed.")). Mr. de Rojas' other opinions were conclusory in nature and not sufficient to create an issue of fact for trial.

With claim 1 of each patent and claim 3 of the '360 patent gone, the court now turns to the remaining limitations in the asserted claims. Cherry argues that the asserted claims in the '130 and '360 patents are invalid as obvious. As noted above, a patent is invalid as obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. While the "ultimate judgment of obviousness is a legal determination," *KSR*, 550 U.S. at 427, that determination "is based on underlying factual inquiries, including (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of non-obviousness." *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018) (citation omitted).

Cherry cites a number of prior art references to demonstrate the scope and content of the prior art, including *Gottschald* and U.S. Patent Nos. 3,834,089 (Barnett); 4,394,099 (Santinelli); 7,540,798 (Shibata 1); 6,089,957 (Shibata 2); 6,623,339 (Igarashi 1); 6,845,678 (Igarashi 2); 2,617,236 (Allen); 6,254,234 (Utsumi); 6,840,851 (Raffaelli); and 3,520,091 (Raphael). It also cites Gerber Optical Elite Edger (1992) COBURNGERBER-COS000001 at 25; the Coburn Catalog (mid-1980s); MEI-COS001-MEI-COS081 (2004–08); and KEVIN WAKEFIELD, BENNETT'S OPHTHALMIC PRESCRIPTION WORK 186–87 (4th ed. 2000). Cherry argues that the combination of these prior art references renders the '360 and '130 patents invalid as obvious.

"The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416. "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 418. But "[i]f a person of ordinary skill in the art

can implement a predictable variation, and would see the benefit of doing so, § 103 likely bars its patentability." *Id.* at 410. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420. As the Supreme Court has explained:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

*Id.* at 421.

Inland argues that claims 2, 4, and 6 of the '360 patent and claim 4 of the '130 patent are not obvious over the disclosure of *Gottschald*, as *Gottschald* is completely silent as to the bevel height and bevel angle of the lenses it utilizes. The '360 patent requires that the bevel and triangle height be 0.25 to 1.1 millimeters and the '360 and '130 patents require an angle range of 100 to 130 degrees.

With respect to claims 2 and 6 of the '360 patent, Cherry asserts that *Barnett*, *Santinelli*, *Shibata*, and *Igarashi* teach bevel heights from 0.0 millimeters to 1.80 millimeters. *See* Dkt. No. 106-36 at 37. It contends that these patents, which were issued as early as 1974, were known in the field of invention and practiced by opticians. Cherry maintains that it would have been obvious to use the edging machines and teachings of these references, in combination with *Gottschald*'s teachings, to cut a bevel and triangle within the height requirements of claims 2 and 6.

As to claim 4 of the '360 and '130 patents, Cherry argues that while *Gottschald* does not teach a limit or range of value for the bevel angles, the ranges would have been inherent in the practice of inventions claimed by the patents. Cherry cites prior art references such as *Allen*, *Shibata 2*, *Utsumi*, *Igarashi 1*, *Igarashi 2*, *Raffaelli*, *Santinelli*, *Raphael*, and *Barnett*, which have

bevel angles ranging from 90 degrees to 130 degrees. In addition, the bevel angles were seen in BENNETT'S OPHTHALMIC PRESCRIPTION WORK, an ophthalmic text, which taught that bevels are usually 115 degrees, as well as the United States Military Specification MIL-S-37954B § 4.4.9 from 1990, which required that lenses used in testing frames have bevels ranging from 110 to 125 degrees. Cherry contends that the bevel angles disclosed in the prior art, which were issued as early as 1967, would have been inherent in the field of invention and well-used by a person of skill in the art practicing the teachings of *Gottschald*. Cherry further asserts that it would have been obvious to a person of ordinary skill in the art to use commonly available edging equipment taught in the prior art to cut the lenses to certain bevel angles as required by the patents.

Considering the prior art, the scope of the patent claims, and the level of skill in the art, the court finds that there is no triable issue as to whether these measurements and angle ranges were well known for the bevel lens design. The claimed elements of the '360 and '130 patents are familiar elements as shown by the numerous prior art references Cherry cites. Inland does not dispute that the prior art references cited by Cherry were in existence at the time of the patent applications and practice these ranges and measurements. In other words, this evidence is undisputed. In this case, combining the teachings of *Gottschald* to include the particular bevel and triangle heights and apex angles taught in the prior art references identified by Cherry would yield predictable results for forming a beveled lens for use with eyeglasses. As a result, the court concludes that it would have been obvious to use these measurements and ranges to create the beveled lenses to insert in eyeglass frames.

As to the secondary considerations, district courts must consider objective evidence of non-obviousness in every case to preclude hindsight bias. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016); *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 977

(Fed. Cir. 2014). "Obviousness is ultimately a legal determination, and a strong showing of obviousness may stand 'even in the face of considerable evidence of secondary considerations.'" *ZUP*, 896 F.3d at 1374 (quoting *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009)); *see also Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) ("[W]here a claimed invention represents no more than the predictable use of prior art elements according to established functions, . . . evidence of secondary indicia are frequently deemed inadequate to establish non-obviousness.").

Inland offers evidence of unexpected results, fulfillment of a long-felt but unresolved need, and a strong skepticism about the viability of the claimed invention. It argues that evidence of these secondary considerations creates a genuine issue of material fact as to the non-obviousness of the asserted patents to preclude summary judgment on this basis. Inland asserts that LensCrafters approached Ronald Wiand, the inventor of the asserted patents, and asked what could be done to resolve the issue of lenses shrinking and becoming loose over time. Wiand Dep. 122:2–13, Dkt. No. 129-5. It also cites the validity report of its expert, Mr. de Rojas, to support its assertion that the patents resolved a long-felt need. Dkt. No. 129 at 19 (citing Dkt. No. 129-3, ¶ 122). More specifically, in his report, Mr. de Rojas stated, "It needs to be understood that Mr. Wiand's patents resolve the multiple factors of how the lens fits into the frame, under compression, with deformation at the vertex of the lens point-of-contact in the bottom of the frame eyewire receiving channel, and how it overcomes the multiple physical factors in size change of the lens over time, such as frame material creep and failures from unwanted compression stresses on the lens." Dkt. No. 129-3, ¶ 122. Inland also notes that Cherry testified that edging the bevel of the lens at 100 degrees reduced spoilage. But given the minimal differences between the prior art and the claimed invention, the statements offered by Inland do not support that the patents resolved a

long-felt need in the industry. *See Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010) ("Where the differences between the prior art and the claimed invention are as minimal as they are here . . . it cannot be said that any long-felt need was unsolved.").

Inland also asserts that, despite the functionality of the asserted patents, Mr. de Rojas testified that he was skeptical of the invention when he was first retained. But Mr. de Rojas was skeptical of the patents' validity, not whether the patented product could be made. *See* de Rojas Dep. 284:3–6, Dkt. No. 129-8 ("I wasn't going to take - - I wasn't going to let you hire me unless I was sure of the circumstances by the patent. I wanted to make sure that I proved that the patent was valid."). Indeed, the evidence of Mr. de Rojas' skepticism supports the obviousness of the patents. Inland's evidence of secondary considerations does not overcome the strong showing of obviousness.

In sum, the court finds that it would have been obvious for a person of ordinary skill in the art to combine the teachings and references in the prior art to invent the claimed method. This finding is not overcome by Inland's evidence of non-obviousness. Accordingly, the court finds by clear and convincing evidence that claims 2, 4, and 6 of the '360 patent and claim 4 of the '130 patent are invalid pursuant to 35 U.S.C. § 103. Cherry's motion for summary judgment is therefore granted on this basis.

## CONCLUSION

For the reasons set forth above, Cherry's motion for summary judgment (Dkt. No. 102) is **GRANTED** and Inland's motion for summary judgment (Dkt. No. 97) is **DENIED**. Inland's motion to exclude certain opinions (Dkt. No. 93), Cherry's motion to strike Inland's expert (Dkt. No. 99), and Inland's motion to strike Cherry's supplemental expert report (Dkt. No. 116) are

**DENIED as moot**. Inland's motion to restrict (Dkt. No. 175) is **GRANTED**. This case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 28th day of September, 2026.

William C. Griesbach
United States District Judge